UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                          :

ABDULLAH JAMES GEORGE WILSON,       :
on behalf of himself and others similarly situated,  :
                                            :   Case No. 1:14-cv-2477 (JPO) (RLE)

                Plaintiff,        :
                                            :

              -against-          :
                                            :

CORELOGIC SAFERENT, LLC,         :
                                            :

                Defendant.      :
                                            :
--------------------------------------------------------------------X


**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS COUNT I OF THE CLASS ACTION COMPLAINT**


TROUTMAN SANDERS LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 704-6000

*Attorneys for Defendant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

FACTUAL ALLEGATIONS ................................................................................................ 2

LEGAL STANDARD........................................................................................................... 2

ARGUMENT ..................................................................................................................... 3

    I.      Plaintiff lacks standing to bring Count I. ................................................................ 4

          A.      Plaintiff lacks Article III standing............................................................... 4

          B.      Plaintiff lacks statutory standing to sue under New York law .................... 7

                1.      Plaintiff lacks statutory standing under the NYFCRA to sue under Count I. ............................................................................ 7

                2.      Plaintiff lacks standing to sue under general principles of New York law. ...................................................................... 10

                      a.      Plaintiff's lack of injury precludes standing under New York law. ................................................................ 10

                      b.      Plaintiff lack of injury precludes standing to sue for injunctive relief and/or punitive damages. ....................... 11

    II.      Plaintiff's claim in Count I, which implicates SafeRent's alleged reporting of truthful, public-record information, is barred by the First Amendment. .......... 12

          A.      The Supreme Court's decision in *Sorrell*................................................. 13

          B.      *Sorrell* has been faithfully applied within the Second Circuit................. 15

          C.      The NYFCRA is an impermissible content and speaker-based restriction on the reporting of truthful, public-record information. .......... 16

    III.      Plaintiff's claim in Count I violates the dormant Commerce Clause, as the statute in question seeks to regulate wholly extraterritorial commerce. .............. 22

          A.      The attempted regulation of wholly-extraterritorial commerce violates the dormant Commerce Clause. ................................................. 22

          B.      The NYFCRA, as applied to Plaintiff's challenge of SafeRent's maintenance of race-based information, violates the dormant Commerce Clause. ................................................................................. 23

    CONCLUSION................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*American Booksellers v. Dean,*
    342 F.3d 96 (2d Cir. 2003) ....................................................................................24

*American Libraries Ass'n v. Pataki,*
    969 F. Supp. 160 (S.D.N.Y. 1997) .......................................................................23

*Arroyo v. PHH Mortg. Corp.,*
    2014 WL 2048384 (E.D.N.Y. May 19, 2014) .........................................................2

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................3

*Baldwin v. G.A.F. Seelig, Inc.,*
    294 U.S. 511 (1935) ..............................................................................................24

*BMW v. Gore,*
    517 U.S. 559 (1996) .........................................................................................12, 23

*Brown v. Payday Check Advance, Inc.,*
    202 F.3d 987 (7th Cir. 2000) ..................................................................................8

*Brown-Forman Distillers Corp. v. New York State Liquor Author.,*
    476 U.S. 573 (1986) ....................................................................................23, 24, 25

*Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.,*
    447 U.S. 557 (1980) ..............................................................................................14

*CGM, LLC v. BellSouth Telcoms., Inc.,*
    664 F.3d 46 (4th Cir. 2011) .....................................................................................7

*David v. Alphin,*
    704 F.3d 327 (4th Cir. 2013) ...................................................................................6

*Dodge v. County of Orange,*
    103 F. App'x 688 (2d Cir. 2004) ...........................................................................11

*Doe v. Chao,*
    540 U.S. 614 (2004) ............................................................................................8, 9

*Doe v. National Bd. of Med. Exam'rs,*
    199 F.3d 146 (3d Cir. 1999) ....................................................................................6

*Donoghue v. Bulldog Investors General Partnership,*
    696 F.3d 170 (2d Cir. 2012) ....................................................................................6

*Expressions Hair Design v. Schneiderman*,
2013 WL 5477607 (S.D.N.Y. Oct. 3, 2013) ...............................................................16, 19

*Friendly House v. Whiting*,
846 F. Supp. 2d 1053 (D. Ariz. 2012) ...........................................................................20

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
528 U.S. 167 (2000) ..........................................................................................................5

*Galloway v. Long Beach Mortg. Co. (In re Galloway)*,
220 B.R. 236 (Bankr. E.D. Pa. 1998) ..............................................................................9

*Gannett Co. v. DePasquale*,
443 U.S. 368 (1979) ........................................................................................................18

*Gladstone, Realtors v. Village of Bellwood*,
441 U.S. 91 (1979) ............................................................................................................5

*Healy v. Beer Inst.*,
491 U.S. 324 (1989) ........................................................................................................23

*In re N.Y. Times Co.*,
600 F. Supp. 2d 504 (S.D.N.Y. 2009) ............................................................................18

*Jones v. Schneiderman*,
974 F. Supp. 2d 322, 332 (S.D.N.Y. 2013) .......................................................................3

*Jones v. Sterling Infosystems, Inc.*,
1:14cv3076 (S.D.N.Y. 2014) ..........................................................................................21

*Kendall v. Employees Ret. Plan of Avon Prods.*,
561 F.3d 112 (2d Cir. 2009) .................................................................................. *passim*

*King v. General Info. Servs.*,
903 F. Supp. 2d 303 (E.D. Pa. 2012) .............................................................................17

*Landmark Communications v. Va.*,
435 U.S. 829 (U.S. 1978) ................................................................................................18

*Lee v. Verizon Communs., Inc.*,
2013 WL 3179503 (N.D. Tex. June 24, 2013) .................................................................6

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..........................................................................................................5

*MacIssac v. Town of Poughkeepsie*,
770 F. Supp. 2d 587 (2d Cir. 2011) ...............................................................................11

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000) .................................................................................2, 3

*Miller v. Equifax Info. Servs., LLC*,
2014 WL 2123560 (D. Or. May 20, 2014) ...............................................................21

*Morant v. Vaughn*,
2009 WL 6651941 (E.D. Va. Jan. 8, 2009) ...............................................................6

*Nixon v. Warner Communications, Inc.*,
435 U.S. 589, 597 (1978)) .......................................................................................18

*North Dakota v. Heydinger*,
2014 WL 1612331 (D. Minn. 2014) .........................................................................24

*Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
322 F.3d 147 (2d Cir. 2003) ......................................................................................7

*Oklahoma Tax Comm'n v. Jefferson Lines Inc.*,
514 U.S. 175 (1995) .................................................................................................22

*Padilla v. Dish Network, L.L.C.*,
2014 WL 539746 (N.D. Ill. Feb. 11, 2014) ...............................................................8

*Pender v. Bank of America Corp.*,
2013 WL 4495153 (W.D.N.C. Aug. 19, 2013) ..........................................................6

*Pharm. Research & Mfrs. of Am. v. District of Columbia*,
406 F. Supp. 2d 56 (D.D.C. 2005) ...........................................................................25

*Raines v. Byrd*,
521 U.S. 811 (1997) ...............................................................................................4, 5

*Simon II Litig. v. Philip Morris USA Inc.*,
407 F.3d 125 (2d Cir. 2005) ....................................................................................12

*Smith v. Daily Mail Publishing Co.*,
443 U.S. 97 (1979) ...................................................................................................18

*Sorrell v. IMS Health Inc.*,
131 S. Ct. 2653 (2011) ..................................................................................... *passim*

*South-Central Timber Dev. Inc. v. Wunnicke*,
467 U.S. 82 (1984) ...................................................................................................22

*Sterk v. Best Buy Stores, L.P.*,
2012 WL 5197901 (N.D. Ill. Oct. 17, 2012) .............................................................6

*Stoner v. CBA Information Services,*
    352 F. Supp. 2d 549 (E.D. Pa. 2005) ................................................................21

*Stuart v. Loomis,*
    2014 WL 186310 (M.D.N.C. 2014) ....................................................................20

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................................................5

*Tarullo v. Def. Contract Audit Agency, United States DOD,*
    600 F. Supp. 2d 352 (D. Conn. 2009) .................................................................9

*The Florida Star v. B.J.F.,*
    491 U.S. 524 (1989) ......................................................................................17, 20

*United States v. Caronia,*
    703 F.3d 149 (2d Cir. 2012) ......................................................................*passim*

*Vaccariello v. XM Satellite Radio,*
    295 F.R.D. 62 (S.D.N.Y. 2011) ..........................................................................4

*Vaughn v. Air Line Pilots Ass'n, Int'l,*
    604 F.3d 703 (2d Cir. 2010) ................................................................................3

*Virgilio v. City of New York,*
    407 F.3d 105 (2d Cir. 2005) ..............................................................................11

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ............................................................................................5

*Zielinski v. Defreest,*
    2013 WL 4838833 (S.D.N.Y. Sept. 10, 2013) ..................................................11

**NEW YORK STATE CASES**

*Downing v. Downing,*
    32 A.D.2d 350 (N.Y. App. Div. 1st Dep't 1969) .................................................8

*Fortune Limousine Service, Inc. v. Nextel Communications,*
    35 A.D.3d 350 (N.Y. App. Div. 2d Dep't 2006) ...............................................11

*Matter of Graziano v County of Albany,*
    3 N.Y.3d 475 (2004) ..........................................................................................10

*Matter of Schwartz v Morgenthau,*
    7 N.Y.3d 427 (2006) ..................................................................................4, 7, 10

*Monges v. Rhea,*
    26 Misc. 3d 1214(A) (N.Y. Sup. Ct. 2009) .......................................................10

*Rocanova v. Equitable Life Assur. Soc'y,*
    83 N.Y.2d 603 (1994) ....................................................................................12

*Schussheim v. Commerce Bank,*
    863 N.Y.S.2d 871 (N.Y. Dist. Ct. 2008) .........................................................10

*Soc'y of Plastics Indus. v. County of Suffolk,*
    77 N.Y.2d 761 (1991) ....................................................................................10

*Town of E. Hampton v. State,*
    263 A.D.2d 94 (N.Y. App. Div. 3d Dep't 1999) ..............................................10

**FEDERAL STATUTES**

5 U.S.C. § 552a(g)(4)(A) ........................................................................................9

15 U.S.C. § 1681c(g) ............................................................................................21

15 U.S.C. § 1681n ...................................................................................................7

42 U.S.C. § 3601, *et seq.* .......................................................................................19

**OTHER STATUTES**

Minn. Stat. § 216H.03 ...........................................................................................24

N.Y. Banking Law 6-l (2) ........................................................................................8

N.Y. Gen. Bus. Law § 380-j(a)(2) ..................................................................1, 2, 3, 4

N.Y. Gen. Bus. Law §§ 380-l, m. .................................................................... *passim*

N.Y. Real Property Law § 861, N.Y ........................................................................8

**RULES**

Fed. R. Civ. P. 12(b)(1) .......................................................................................1, 2

Fed. R. Civ. P. 12(b)(6) ....................................................................................1, 2, 3

**OTHER AUTHORITIES**

Corrections, *Profile of Inmate Population Under Custody* (2013), *available a*t
    http://www.doccs.ny.gov/Research/annotate.asp ..............................................21

FBI: *Age, Sex, and Race of Persons Arrested*, *available at* http://www.fbi.gov/about-
    us/cjis/ucr/nibrs/addendum-for-submitting-cargo-theft-data/asr ...........................21

Defendant, CoreLogic SafeRent, LLC ("SafeRent"), by counsel, submits this memorandum of law in support of its Motion to Dismiss Count I of the Class Action Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## INTRODUCTION

Plaintiff's five-count Complaint asserts class and individual claims challenging a consumer report that SafeRent provided to Plaintiff's potential landlord.  This Motion seeks dismissal of Count I, which is an attempted class claim by a Plaintiff who has suffered no injury sufficient to give rise to standing, and which is based upon the flawed premise that a state law can constitutionally prohibit the publication of certain information from a public record.

In Count I, Plaintiff alleges a violation of the New York Fair Credit Reporting Act, N.Y Gen. Bus. Law § 380-j(a)(2) ("NYFCRA").  The NYFCRA purports to prohibit "consumer reporting agencies," such as SafeRent, from maintaining and reporting public record information concerning the race of the consumer.  Plaintiff claims that SafeRent "maintained" and "reported" a public criminal record containing information about his race in violation of the NYFCRA.

The Complaint contains no allegation, however, that Plaintiff suffered any actual injury as a result of SafeRent's alleged transmission of public record that included, among multiple data points, accurate information about his race.[1]  Count I must be dismissed under Fed. R. Civ. P. 12(b)(1) because Plaintiff has alleged no "injury in fact," which is a prerequisite to Plaintiff having standing under Article III of the Constitution, as well as under New York law.

To the extent that Plaintiff somehow has standing to invoke the NYFCRA, that claim fails on other constitutional grounds.  To undersigned counsel's knowledge, N.Y Gen. Bus. § 380-j(a)(2)d has never been the subject of constitutional scrutiny, making this a case of first

---

[1] Count I is different from the claim in Count II, where Plaintiff contends that he suffered "actual damages" as a result of SafeRent's alleged reporting of a criminal record that contained "legally obsolete" information.  Compl. ¶¶ 21-22, 41.  (Although this Motion addresses only Count I, SafeRent denies the allegations in Count II, including Plaintiff's allegation that he suffered any actual damages.)

impression.   However, for the reasons detailed below, under settled First Amendment and dormant Commerce Clause principles, the prohibition of the reporting and maintenance of public court records contained in N.Y Gen. Bus. Law § 380-j(a)(2) must be invalidated.

### FACTUAL ALLEGATIONS

On or about April 16, 2012, Plaintiff applied for and was offered an apartment in Bronx, New York, subject to a routine background check.  Compl. ¶ 18.  A leasing agent requested, and SafeRent prepared, a "Lease Decision" report.  *Id.* ¶ 19.  The Lease Decision report contained information on Plaintiff's felony conviction from a public court record, which noted his "race as 'black.'"  *Id.* ¶¶ 20, 45.  There is no claim SafeRent reported Plaintiff's race inaccurately.

SafeRent is a nationwide consumer reporting agency that compiles and maintains files on adults throughout the United States.  *Id.* ¶ 7.  SafeRent's files include public court records of criminal histories.  *Id.* ¶ 7.  Plaintiff alleges that he is a member of a similarly situated class of consumers "residing in the State of New York" as to whom SafeRent "reported or maintained in its files the race of the consumers."  *Id.* ¶ 25.  The Complaint is devoid of any allegation that Plaintiff suffered or is even threatened with any harm because the Lease Decision report included a public court record that identified Plaintiff's "race as 'black.'"

### LEGAL STANDARD

SafeRent brings this motion under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  A motion that challenges the plaintiff's standing is evaluated under Fed. R. Civ. P. 12(b)(1).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  On a Rule 12(b)(1) motion, the district court must take all uncontroverted facts in the complaint as true, but it cannot "draw argumentative inferences in favor of Plaintiffs because subject matter jurisdiction must be shown affirmatively."  *Arroyo v.*

*PHH Mortg. Corp.*, 2014 WL 2048384, at *4 (E.D.N.Y. May 19, 2014).  When jurisdiction is disputed, however, the party asserting jurisdiction "has the burden of proving by a preponderance of the evidence that it exists."  *Makarova*, 201 F.3d at 113.

Constitutional challenges are decided under Fed. R. Civ. P. 12(b)(6).  *See, e.g.*, *Jones v. Schneiderman*, 974 F. Supp. 2d 322, 332 (S.D.N.Y. 2013).  To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual allegations to "state a claim for relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010).  While the court must accept "well-pleaded factual allegations" as true, it should not accept "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft*, 556 U.S. at 678-79. Plausibility requires "more than a sheer possibility" that the requested relief will be granted.  *Id.* at 678 (internal citations omitted).

### ARGUMENT

Count I of the Complaint asserts a claim under N.Y. Gen. Bus. Law § 380-j(a)(2), which states that "[n]o consumer reporting agency shall report or maintain in the file on a consumer, information . . . relative to a consumer's race, religion, color, ancestry or ethnic origin."  Compl. ¶ 36.  Plaintiff alleges that SafeRent maintained and reported information relative to Plaintiff's race taken from the public court record of his felony conviction, and asserts a claim on behalf of a putative class of all New York consumers for whom, during the previous two years, SafeRent reported and/or maintained in its files the race of the consumers.  *Id.* ¶ 25.  Plaintiff alleges that the violation in Count I was willful, and that this entitles him to punitive damages.  *Id.* at ¶ 36.

Plaintiff seeks *only* injunctive relief, punitive damages, and attorneys' fees and costs under Count I.  *Id.*  No actual damages are alleged or sought under Count I, *see id.* at ¶¶ 31-36, and no statutory damages are available under the NYFCRA.  N.Y. Gen. Bus. Law §§ 380-l, m.

### I.       Plaintiff lacks standing to bring Count I.

Because Plaintiff has not suffered nor is even under the threat of harm, Plaintiff lacks

standing to assert a claim under the NYFCRA as a matter of both federal and state law.  Plaintiff

chose to file this action in federal court, and therefore must establish standing under Article III of

the United States Constitution.  The failure to allege any identifiable actual harm in Count I

means that, as a matter of law, Plaintiff has suffered no "injury in fact," which is a constitutional

prerequisite to invoking the jurisdiction of this Court.  *Kendall v. Employees Ret. Plan of Avon*

*Prods.*, 561 F.3d 112, 118 (2d Cir. 2009); *Vaccariello v. XM Satellite Radio*, 295 F.R.D. 62, 73

(S.D.N.Y. 2011).  The answer is the same under New York state law.  The NYFCRA does not

provide a cause of action to persons who have suffered no actual damages.  N.Y. Gen. Bus. Law

§ 380-j(a)(2).  And, Plaintiff's lack of any alleged actual injury further means he lacks standing

to pursue any claim as a matter of New York state law, including to claims for punitive damages

and injunctive relief.  *See, e.g.*, *Matter of Schwartz v. Morgenthau*, 7 N.Y.3d 427, 432 (2006).

### A.       Plaintiff lacks Article III standing.

Any litigant invoking the jurisdiction of a federal court must independently satisfy the

requirements of standing under Article III of the Constitution.  Under Article III, the judiciary's

power is limited to "cases" and "controversies."  U.S. Const. art. III, § 2.  If the action before the

federal court is not a case or controversy, the federal court is without jurisdiction to consider the

action.  *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  "This is a 'bedrock requirement.'"  *Id.*

One element of the case or controversy requirement is that a plaintiff must show standing

to sue.  *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  To establish

standing (and thus federal jurisdiction) under Article III, a plaintiff bears the burden of showing

that he: "(1) has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual

or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged

action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).  The injury-in-fact requirement is the "irreducible constitutional minimum" for standing.  *Lujan*, 504 U.S. at 560-61.  Furthermore, for an injury in fact to satisfy the Article III standing requirements, the injury must be "distinct and palpable" and not "conjectural" and/or "hypothetical."  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

It is well settled that a legislature "cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) (citing *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979)).  "In no event . . . may [the legislature] abrogate the Art. III minima: A plaintiff must always have suffered a distinct and palpable injury to himself . . . that is likely to be redressed if the requested relief is granted."  *Gladstone*, 441 U.S. at 100 (internal quotation marks omitted).  This "requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).

These principles have been affirmed by the Second Circuit.  In *Kendall v. Employees Retirement Plan of Avon Products*, the Second Circuit considered the "argument that a plaintiff has standing to sue for a breach of fiduciary duty under ERISA without a showing of individualized harm."  561 F.3d at 120.  In finding that the plaintiff lacked standing, the court rejected the argument that "either an alleged breach of fiduciary duty to comply with ERISA, or a deprivation of [the plaintiff's] entitlement to that fiduciary duty, in and of themselves constitutes an injury-in-fact."  *Id.* at 121.  The court explained that although "plan fiduciaries have a statutory duty to comply with ERISA," "Kendall must allege some injury or deprivation of a specific right that arose from a violation of that duty in order to meet the injury-in-fact requirement.  Kendall cannot claim that either an alleged breach of fiduciary duty to comply with

ERISA, or a deprivation of her entitlement to that fiduciary duty, in and of themselves constitute an injury-in-fact sufficient for constitutional standing." *Id.*[2]

Similarly, courts nationwide have concluded that an "injury-in-fact" must be more than an alleged statutory violation. *See, e.g. David v. Alphin*, 704 F.3d 327, 338-39 (4th Cir. 2013) (holding that the "deprivation of [a] statutory right" is insufficient to confer Article III standing, as "this theory of Article III standing is a non-starter as it conflates statutory standing with Article III standing"); *Doe v. National Bd. of Med. Exam'rs*, 199 F.3d 146, 150 (3d Cir. 1999) ("[Plaintiff] incorrectly equates a violation of a statute with an injury sufficient to confer standing. The proper analysis of standing focuses on whether the plaintiff suffered an actual injury, not on whether a statute was violated."); *Pender v. Bank of America Corp.*, 2013 WL 4495153, at *9-10 (W.D.N.C. Aug. 19, 2013) (same); *Lee v. Verizon Communs., Inc.,* 2013 WL 3179503, at *15 (N.D. Tex. June 24, 2013) (same); *Sterk v. Best Buy Stores, L.P.*, 2012 WL 5197901, at *6 (N.D. Ill. Oct. 17, 2012) ("[A] plaintiff must plead an injury beyond a statutory violation to meet the standing requirement of Article III."); *Morant v. Vaughn*, 2009 WL 6651941, at *4 (E.D. Va. Jan. 8, 2009) ("The proper analysis of standing focuses on whether plaintiff suffered an actual injury, not on whether a statute was violated.") (citations omitted).

---

[2] Presumably, Plaintiff will try to rely on the Second Circuit's decision in *Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170 (2d Cir. 2012), as the basis for claiming Article III standing. *Donoghue* noted that "a legally protected interest may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Id.* at 175. Yet, *Donoghue* is easily distinguished from the instant case, since it involved a securities fraud statute that "created legal rights that clarified the injury that would support standing, specifically, the breach by a statutory insider of a fiduciary duty owed to the issuer not to engage in and profit from any short-swing trading its stock," and which provided for disgorgement to the effected parties upon such a violation. *Id.* at 179. No similar statutory clarification or allowance for disgorgement exists in the NYFCRA. Furthermore, the court in *Donoghue* expressly noted that its decision, which was specific to the securities fraud statute at issue, in no way affected its prior decision in *Kendall*. *Id.* at 178-79. And, the decision in *Kendall*, which involved a bare statutory violation of a statute that did not codify an otherwise-cognizable injury-in-fact into law, is far more analogous to this NYFCRA action, which is also based on a bare statutory claim, than it is to the unique investor circumstances that were present in *Donoghue*.

6

Plaintiff has not alleged that he suffered any injury or harm whatsoever as a result of the reporting of his race.  And, Plaintiff's allegation that the statute was violated does not solve the problem, as a mere allegation of a violation of a statute does not establish the existence of a sufficient "injury-in-fact" to establish standing.  Plaintiff cannot claim that a technical violation of the NYFCRA, divorced from any actual injury, is an injury-in-fact.  Therefore, Count I should be dismissed for want of jurisdiction under Article III of the United States Constitution.

**B.**     **Plaintiff lacks statutory standing to sue under New York law.**

When jurisdiction is predicated on diversity of citizenship, in addition to Article III standing, a plaintiff must also have standing applicable state law.  *See, e.g.*, *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 156-57 (2d Cir. 2003) (applying state law of standing in a diversity action to determine if plaintiffs had standing to bring claim of breach of fiduciary duty).  When suing under a statute, a plaintiff must establish "statutory standing," meaning a plaintiff "must identify *a statutory endorsement* of the action," *Kendall*, 561 F.3d at 118 (emphasis added), and he also demonstrate an "injury-in-fact" under principles of New York law.  *Morgenthau*, 7 N.Y.3d at 432.  Plaintiff fails these tests.

**1.**     **Plaintiff lacks statutory standing under the NYFCRA to sue under Count I.**

A challenge to statutory standing requires the court to examine "legislatively-created causes of action and concerns whether a statute creating a private right of action authorizes a particular plaintiff to avail herself of that right of action."  *CGM, LLC v. BellSouth Telcoms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011); *accord Kendall*, 561 F.3d at 118.

Unlike the federal FCRA, which expressly allows for the recovery of statutory damages upon a violation, *see* 15 U.S.C. § 1681n, the NYFCRA contains *no such authorization* for statutory damages.  Rather, the text of the NYFCRA explicitly states that "civil liability" may only be sought when "actual" damages are sustained by a consumer, along with "punitive"

damages upon the showing of a willful violation.  *See* N.Y. Gen. Bus. Law §§ 380-l, m (upon a violation, a "consumer reporting agency" may be liable for "(a) any actual damages sustained by the consumer as a result of the failure; (b) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.").  Indeed, although the New York legislature has seen fit to provide for the recovery of statutory damages in numerous other contexts, *see, e.g.*, N.Y. Real Property Law § 861, N.Y. Labor Law § 198(1)(a), N.Y. Banking Law 6-l (2), it has expressly not done so under the NYFCRA.  *See Downing v. Downing*, 32 A.D.2d 350, 352 (N.Y. App. Div. 1st Dep't 1969) ("The function of the court is to enforce the statute and not add words which can only exist in the mind's eye, in order to effect a thought never articulated by the Legislature.").  Thus, the NYFCRA contains no "statutory endorsement" of a "no-damages" cause of action, *see Kendall*, 561 F.3d at 118, and Plaintiff cannot pursue such a claim here.

Courts interpreting similar federal and state statutes have ruled consistently that claims brought by "no-damages" plaintiffs must be dismissed when the statute on which the plaintiff has sued makes no allowance for the recovery of statutory damages.  *See, e.g., Doe v. Chao,* 540 U.S. 614, 627 (2004) ("The 'entitle[ment] to recovery' [under the Privacy Act of 1974] . . . is not shown merely by an intentional or willful violation of the Act producing some adverse effect. The statute guarantees [damages] only to plaintiffs who have suffered some actual damages."); *Brown v. Payday Check Advance, Inc.*, 202 F.3d 987, 989 (7th Cir. 2000) (Plaintiffs' claims under [TILA] alleging defendants failed to properly disclose the "total of payments," could not stand without actual damages, as statutory damages were not available); *Padilla v. Dish Network, L.L.C.*, 2014 WL 539746, at *2 (N.D. Ill. Feb. 11, 2014) (dismissing claim under Satellite Home Viewer Extension and Reauthorization Act because the statute only provided for actual damages (or liquidated damages upon a finding of actual damages), and plaintiff had not sustained nor

alleged any actual damages); *Galloway v. Long Beach Mortg. Co. (In re Galloway)*, 220 B.R. 236, 245 (Bankr. E.D. Pa. 1998) ("[E]ven if Long Beach's disclosure of the itemization of the amount financed was nonconforming [under TILA,] the Debtor is entitled to no damages. Statutory damages are unavailable for the type of violation alleged, and the Debtor has proven no actual damages."). The same result must obtain here.

The Supreme Court's decision in *Doe v. Chao* is particularly instructive. In *Chao*, when a claimant filed for black lung benefits, the government disclosed the claimant's Social Security number beyond the limits set by 5 U.S.C. § 552a of the Privacy Act of 1974, which provided that a plaintiff could recover "actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000." 540 U.S. at 617 (internal citation omitted). The claimant provided no proof of actual damages. *Id.* at 617-18. The claimant, however, argued that 5 U.S.C. § 552a(g)(4)(A) entitled him to the $1,000 minimum on proof of nothing more than a statutory violation. The Supreme Court disagreed and determined that, under the plain language of the statute, which did not allow for the recovery of statutory damages, a plaintiff needed to prove some "actual damages" to qualify for the minimum award of $1,000. *Id.* at 621. Plaintiff thus lacked statutory standing to bring the cause of action. *Id.*; *accord Tarullo v. Def. Contract Audit Agency, United States DOD*, 600 F. Supp. 2d 352, 359 (D. Conn. 2009) (dismissing claim on the following basis: "Plaintiff does not even allege that he suffered any adverse consequences from the [Social Security number] disclosures involved here . . . . Indeed, the record as a whole contains no evidence that the disclosures of the Plaintiff's SSN had an adverse effect on the Plaintiff other than the displeasure he felt because these disclosures were against his wishes. At most, the Plaintiff has demonstrated statutory violations only.").

Plaintiff has not alleged any actual damages under Count I of the Complaint, and the NYFCRA does not provide for liability in a "statutory" manner.   Therefore, Plaintiff has no standing under the statute.   Count I must be dismissed.

### 2.   Plaintiff lacks standing to sue under general principles of New York law.

In addition to lacking statutory standing under the NYFCRA, Plaintiff also lacks standing to sue under general principles of New York law, both generally and as to the relief requested.

### a.   Plaintiff's lack of injury precludes standing under New York law.

For New York state law causes of action, standing is "a threshold determination" that, "when challenged, must be considered at the outset of any litigation." *Soc'y of Plastics Indus. v. County of Suffolk*, 77 N.Y.2d 761, 782 (1991).   Under New York law, "an analysis of standing begins with the determination of whether the party seeking relief has sustained an injury." *Id.* at 772-73.   "A petitioner must have a legally cognizable injury in order to obtain standing, specifically, an 'injury in fact – an actual legal stake in the matter being adjudicated.'" *Monges v. Rhea*, 26 Misc. 3d 1214(A), 1214(A) (N.Y. Sup. Ct. 2009) (citations omitted).   An injury-in-fact has been explained as being an "aggrievement, or the adverse effect upon [a plaintiff]." *Morgenthau*, 7 N.Y.3d at 432.   The injury "must be more than conjectural." *Matter of Graziano v County of Albany*, 3 N.Y.3d 475, 479 (2004).   Standing will not be found if such injury occurred in "a factual vacuum," with the alleged violation having no actual effect on the plaintiff. *Town of E. Hampton v. State*, 263 A.D.2d 94, 96 (N.Y. App. Div. 3d Dep't 1999). Thus, "the mere violation of a statute without a statutory penalty or without a show of actual damages cannot form the basis of a recovery." *Schussheim v. Commerce Bank*, 863 N.Y.S.2d 871, 873-84 (N.Y. Dist. Ct. 2008).

Plaintiff does not satisfy these standards.   In this case, Plaintiff has failed to allege any injury-in-fact relative to the reporting of his race in Count I.   In essence, therefore, Plaintiff is

attempting to act as a "private attorney general," which is not allowed under New York law or the NYFCRA. *See Fortune Limousine Service, Inc. v. Nextel Communications*, 35 A.D.3d 350, 353 (N.Y. App. Div. 2d Dep't 2006) ("Fortune has failed to invoke any statute or case law authorizing it to serve as a 'private attorney general' to vindicate the rights of the public by seeking a permanent injunction.").

### b.   Plaintiff lack of injury precludes standing to sue for injunctive relief and/or punitive damages.

In addition to a lack of standing under these general principles of New York law, Plaintiff specifically lacks standing under Count I to seek injunctive relief and punitive damages.

To obtain an injunction "a plaintiff must show that he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," and that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 593 (2d Cir. 2011) (internal citations and quotations omitted). "[C]ourts in this circuit, have repeatedly underscored that in the context of injunctive relief: 'It is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.'" *Zielinski v. Defreest*, 2013 WL 4838833, at *17 (S.D.N.Y. Sept. 10, 2013) (internal citations omitted). And, in a class action seeking injunctive relief, "the named plaintiffs . . . must themselves have standing to seek injunctive relief." *Dodge v. County of Orange*, 103 F. App'x 688, 690 (2d Cir. 2004). Therefore, because Plaintiff lacks standing in Count I, he lacks standing to seek the requested injunctive relief on behalf of himself and the putative class.

Plaintiff also seeks punitive damages under Count I without any accompanying claim that he has suffered actual injury as a result of the transmission of information regarding his race. *See* Compl., ¶¶ 31-36. Under established New York law, however, punitive damages are not recoverable absent a parallel showing of actual damages. *Virgilio v. City of New York*, 407 F.3d

105, 117 (2d Cir. 2005) ("[W]hile punitive damages are not curative in nature, under New York law they cannot be invoked without some compensatory injury") (citations omitted); *see also Rocanova v. Equitable Life Assur. Soc'y*, 83 N.Y.2d 603, 616 (1994) ("absent a valid claim for compensatory damages, there could be none for punitive damages") (citations omitted).[3]  Hence, the claim for punitive damages must also be straightforwardly dismissed.

In summation, the lack of standing conferred by the NYFCRA to bring a lawsuit without injury is confirmed by New York's general principles of standing.  Plaintiff is required to have an injury-in-fact to bring any lawsuit.  Therefore, Count I must be dismissed in its entirety.

## II.    Plaintiff's claim in Count I, which implicates SafeRent's alleged reporting of truthful, public-record information, is barred by the First Amendment.

Even if Plaintiff had standing to bring Count I, it must still be dismissed.  Plaintiff alleges SafeRent violated the NYFCRA by truthfully "reporting and maintaining information in the files of New York consumers relative to consumer's race, religion, color, ancestry or ethnic origin." Compl. ¶ 34.  The statute's restrictions on the "maintenance" and "reporting" of information thus restrict the flow of speech, creating First Amendment concerns.  The Supreme Court's decision in *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011), emphatically reasserted the First Amendment's protection for the disclosure of truthful commercial information (let alone *public-record* information).  Particularly in light of how *Sorrell* has been applied within the Second Circuit, the maintenance and reporting restrictions of the NYFCRA are unconstitutional.

---

[3] This issue also intersects with those cases placing constitutional limits on the ratio of punitive damages that can be recovered, which affirm that no punitive damages are available without any corresponding actual injury that can be used to drive the proportionality analysis.  *See generally BMW v. Gore*, 517 U.S. 559, 571 (1996).  Indeed, the Second Circuit has noted that this concern is especially prevalent in the context of putative class actions.  *Simon II Litig. v. Philip Morris USA Inc.*, 407 F.3d 125, 138 (2d Cir. 2005) ("In certifying a class that seeks an assessment of punitive damages prior to an actual determination and award of compensatory damages, the district court's Certification Order would fail to ensure that a jury will be able to assess an award that, in the first instance, will bear a sufficient nexus to the actual and potential harm to the plaintiff class, and that will be reasonable and proportionate to those harms.").  In other words, in cases such as this, without a baseline of actual damages from which to assess the proportionality of an award of punitive damages, those constitutional concerns cannot be resolved.

A.      The Supreme Court's decision in *Sorrell*.

The constitutionality of the NYFCRA must be gauged by the Supreme Court's reasoning and holding in *Sorrell*.  In *Sorrell*, Vermont enacted a law targeting drug companies who obtain data about doctors' prescription practices and then target those doctors with marketing designed to persuade them to purchase specific brand-name drugs.  *Id.* at 2659-60.  Drug companies obtained the prescriber data from data brokers, who in turn obtained it from pharmacies that maintain records of prescriptions and the doctors who prescribed those drugs.  *Id.* at 2660.  The Vermont statute prohibited pharmacies and data brokers from selling prescriber data if the data would be used for marketing, and prohibited drug companies from using prescriber data to market their drugs.  *Id.* at 2660-61.  Drug companies and data brokers affected by the statute then challenged it on First Amendment grounds.  *Id.*

The Supreme Court held Vermont's restrictions on the sale of prescriber data violated the First Amendment.  The Court first explained that prescriber data is "speech" under the First Amendment.  "[T]he creation and dissemination of information are speech within the meaning of the First Amendment . . . .  Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs."  *Id.* at 2667.  "If the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct."  *Id.*

The Court next discussed the nature of the restriction.  The Court explained that the Vermont statute "enacts content- and speaker-based restrictions on the sale, disclosure, and use of prescriber-identifying information."  *Id.* at 2663.  Specifically, the statute permitted pharmacies and data brokers to sell prescriber data to insurance companies, university researchers, journalists, and anyone else except those using it for marketing purposes.  *Id.*  "The statute thus disfavors marketing, that is, speech with a particular content."  *Id.*  "More than that,

13

the statute disfavors specific speakers, namely pharmaceutical manufacturers." *Id*.  The end result of these restrictions was to preclude "detailers—and only detailers—from communicating with physicians in an effective and informative manner." *Id*.  Therefore, the Court held that the Vermont statute "imposes a speaker- and content-based burden on protected expression, and that circumstance is sufficient to justify application of heightened scrutiny." *Id*. at 2667.

The Court then applied that "heightened scrutiny." *Id*. at 2664.  In doing so, the Court explained there was no need to determine whether the prescriber data was ordinary speech or commercial speech.  The test for laws burdening commercial speech generally is less strict than the test for laws burdening core protected speech. *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U.S. 557, 566 (1980).  However, in *Sorrell*, the Court explained that, "[a]s in previous cases" involving content-based and speaker-based restrictions, "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." 131 S. Ct. at 2667.

The Court then held that under a standard commercial speech inquiry, "it is the State's burden to justify its content-based law as consistent with the First Amendment." *Id.*  To satisfy that burden, "the State must show at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Id*. at 2667-68.  "There must be a fit between the legislature's ends and the means chosen to accomplish those ends." *Id.* at 2668 (internal quotation marks omitted).

In an attempt to meet that test, Vermont asserted two categories of governmental interests.  The Court rejected both arguments because the "fit" between the government interest and the means used to accomplish it was insufficient. *Id*.  Vermont first argued that the statute was necessary "to protect medical privacy, including physician confidentiality, avoidance of harassment, and the integrity of the doctor-patient relationship." *Id*. at 2668.  But the Court held

that the statute was not drawn to serve this interest because "pharmacies may share prescriber-identifying information with anyone for any reason save one: They must not allow the information to be used for marketing." *Id*.  For example, sharing prescriber data with insurance companies, university researchers, or journalists raised the identical concerns, yet the statute did not prohibit pharmacies from selling the data to those groups and did not regulate how those groups could use the data.  "The explicit structure of the statute allows the information to be studied and used by all but a narrow class of disfavored speakers.  Given the information's widespread availability and many permissible uses, the State's asserted interest in physician confidentiality does not justify the burden that [the statute] places on protected expression." *Id*.

Vermont further argued that, by using prescriber-identifying information, drug marketers can more effectively market their brand-name drugs (as opposed to less-expensive alternatives), thereby increasing the costs of healthcare.  The Court rejected this argument because "[w]hile Vermont's stated policy goals may be proper, [the statute] does not advance them in a permissible way." *Id*. at 2670.  "The State seeks to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers—that is, by diminishing detailers' ability to influence prescription decisions." *Id*.  The Court held that this approach did not "fit" the government's purported interests because the "fear that people would make bad decisions if given truthful information cannot justify content-based burdens on speech." *Id*.  Hence, Vermont's restrictions violated the First Amendment. *Id.*

### B.   *Sorrell* **has been faithfully applied within the Second Circuit.**

The decision in *Sorrell* has since formed the basis for decisions within the Second Circuit invalidating a number of restrictive statutes.  In *United States v. Caronia*, 703 F.3d 149 (2d Cir. 2012), for instance, the Second Circuit held that a federal statute criminalizing "manufacturer promotion of off-label use while permitting others to promote such use" failed First Amendment

scrutiny. *Id.* at 163-64.  In so holding, the Second Circuit cited extensively to *Sorrell*.  *See id.*  The court noted that, "[i]f the First Amendment means anything, it means that regulating speech must be a last – not first – resort." *Id.* at 168.  The court also stated that "while some off-label information could certainly be misleading or unhelpful, this case does not involve false or misleading promotion." *Id.* at 168.  In other words, the court recognized that the speech in question was entirely truthful.  Furthermore, in discussing whether the restriction reasonably "fit" the aims of the legislature, the Second Circuit stated:

> If the government's objective is to shepherd physicians to prescribe drugs only on-label, criminalizing manufacturer promotion of off-label use while permitting others to promote such use to physicians is an indirect and questionably effective means to achieve that goal.  Thus, the government's construction of the [statute's] misbranding provisions does not directly advance its interest in reducing patient exposure to off-label drugs or in preserving the efficacy of the FDA drug approval process because the off-label use of such drugs continues to be generally lawful.  Accordingly, the government's prohibition of off-label promotion by pharmaceutical manufacturers provides only ineffective or remote support for the government's purpose.

*Id.*  The court ultimately held that "if the government is concerned about the use of drugs off-label, it could more directly address the issue" through the use of "numerous" alternatives. *Id.*[4]

### C.   The NYFCRA is an impermissible content and speaker-based restriction on the reporting of truthful, public-record information.

There can be no question that the NYFCRA imposes both a content- and speaker-based restriction of speech.  It restricts the reporting of a specific type of information regarding a consumer: race.  N.Y. Gen. Bus. Law § 380-j(a)(2).  The statute applies only to a narrow class of

---

[4] Likewise, in *Expressions Hair Design v. Schneiderman*, 2013 WL 5477607 (S.D.N.Y. Oct. 3, 2013), citing *Sorrell*, the court struck down a section of the New York General Business Law with the following type of prohibition: "If a vendor is willing to sell a product for $100 cash but charges $102 when the purchaser pays with a credit card, the vendor risks prosecution if it tells the purchaser that the vendor is adding a 2% surcharge because the credit card companies charge the vendor a 2% 'swipe fee.'  But if, instead, the vendor tells the purchaser that its regular price for the product is $102, but that it is willing to give the purchaser a $2 discount if the purchaser pays cash, compliance with section 518 is achieved." *Id.* at *8.  The court held that this "distinction between what a vendor can and cannot tell its customers offends the First Amendment." *Id.*  The court noted that it was a ban on "lawful" and "non-misleading" speech, which was also made in the context of a prohibition that "was riddled with [regulatory] exceptions," thereby failing constitutional scrutiny. *Id.* at *16.

speakers: consumer reporting agencies.  *Id.*  Thus, per *Sorrell*, the NYFCRA is constitutional only if Plaintiff can show "that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest," 131 S. Ct. at 2667-68, and that there is "a fit between the legislature's ends and the means chosen to accomplish those ends."  *Id.* at 2668.[5]

Despite its scant legislative history, the NYFCRA restriction at issue was presumably focused on preventing discrimination on the basis of race.  However, in *Sorrell*, the Court held that the "fear that people would make bad decisions if given truthful information cannot justify content-based burdens on speech."  *Id*. at 2670-71.  In sum, after *Sorrell*, the government cannot justify content-based, speaker-based bans on *disclosure* of truthful commercial information by pointing to a government interest in controlling how the recipients *use* that information.  *See id.*

This principle applies with even greater force in this case because, unlike in *Sorrell* and *Caronia*, the criminal record information suppressed by the statute here is a matter of *public record*.  Compl. ¶ 45.  As the Supreme Court has held, "where the government has made certain information publicly available, it is highly anomalous" to punish parties who later disseminate that information.  *The Florida Star v. B.J.F.*, 491 U.S. 524, 535 (1989).  "[D]issemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which [the government] seeks to act."  *Id*.  "By placing the information in the public domain on official court records, [the government] must be presumed to have concluded that the public interest was thereby being served."  *Id*.  In short, "once truthful information was

---

[5] Over a First Amendment challenge, the United States District Court for the Eastern District of Pennsylvania upheld a provision of the FCRA that barred the reporting of stale criminal charges.  *King v. General Info. Servs.*, 903 F. Supp. 2d 303, 308-09 (E.D. Pa. 2012).  That case is readily distinguishable from this action for many reasons, including the fact that the NYFCRA seeks to carve out one piece of an *otherwise-reportable* and timely record.  (Indeed, SafeRent complies with all of the temporal limitations on reporting imposed under the FCRA and affirmed in *King*.)  In any event, however, it is the law of the Second Circuit and the United States Supreme Court that controls here for purposes of the First Amendment analysis.

'publicly revealed' or 'in the public domain' [the government] could not constitutionally restrain its dissemination." *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103 (1979).

Indeed, "[t]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents," as "such a right furthers the citizen's desire to keep a watchful eye on the workings of public agencies." *In re N.Y. Times Co.*, 600 F. Supp. 2d 504, 507 (S.D.N.Y. 2009) (quoting *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978)). This is a result of the "extraordinary protections afforded by the First Amendment" with respect to the reporting of judicial proceedings. *Gannett Co. v. DePasquale*, 443 U.S. 368, 413 (1979). And, due to the indisputable First Amendment right of access to court proceedings and records, the Supreme Court has readily recognized a right to publish that same information to third parties. *See, e.g., Landmark Communications v. Va.*, 435 U.S. 829, 837 (1978) (the "First Amendment" prohibits the "punishment of third persons . . . divulging or publishing truthful information" regarding judicial proceedings). Thus, it would be both highly incongruous and violative of the First Amendment to subject an entity to punishment based on nothing more than the verbatim reporting of a public criminal record. *See id*.

The NYFCRA also fails to "fit" the New York legislature's goals because it targets speech by only a single group. The restrictions in *Sorrell* had this identical defect. Although the law prohibited pharmacies from selling the prescriber data to drug companies, it permitted pharmacies to sell that data to "insurers, researchers, journalists" and anyone else. *Sorrell*, 131 S. Ct. at 2668. The Court noted Vermont could have restricted the use of the prescriber data to "narrow and well-justified circumstances." *Id*. But the Court held that Vermont "did not enact a statute with that purpose or design. Instead, Vermont made prescriber-identifying information available to an almost limitless audience. The explicit structure of the statute allows the information to be studied and used by all but a narrow class of disfavored speakers." *Id*.

Because of the "widespread availability" of that data, the Court held that Vermont's interests do not "justify the burden [the statute] places on protected expression."  *Id*.

The same was true in *Caronia*, where the Second Circuit held that the statute's "criminalizing manufacturer promotion of off-label use while permitting others to promote such use to physicians is an indirect and questionably effective means to achieve that goal," thereby failing First Amendment scrutiny.  703 F.3d at 168; *see also Expressions Hair Design*, 2013 WL 5477607, at *16 (holding that the state statutory prohibition in question was "was riddled with [regulatory] exceptions," thereby failing constitutional scrutiny).

Just as the Vermont statute permitted prescriber data to be sold to, and used by, "an almost limitless audience," *Sorrell*, 131 S. Ct. at 2668, the NYFCRA permits employers, lenders, and landlords to obtain public records containing race information from *virtually any source* except a consumer reporting agency.  Government agencies, court clerks, other regulators, free online databases, neighbors, community groups, news organizations, and countless other sources all are permitted to disclose this information; only consumer reporting agencies are prohibited from doing so.  Even *the landlord* evaluating Plaintiff's housing application was free to retrieve race information from the public record.  The statute permits *anyone* except a consumer reporting agency to disclose race information within public records for *any reason*.  Thus, because New York's discrimination concern would apply regardless of the source of the information, a content- and speaker-based restriction solely on consumer reporting agencies, which itself applies only to a small subset of otherwise-reportable public records, does not "fit" the concern.

Indeed, while the prevention of race discrimination is a valid government concern, New York can achieve the same result through far less restrictive (and logical) means.  New York and federal law already prohibit landlords from discriminating on the basis of race.  *See* N.Y. Human Rights Law (Executive Law § 296); 42 U.S.C. § 3601, *et seq*. (federal Fair Housing Act).  Thus,

the public interest sought to be advanced by the relevant NYFCRA prohibition has already been addressed in a far more direct and meaningful way, and in a manner that does not seek to restrict speech.  In such circumstances, courts have repeatedly struck down statutes on First Amendment grounds.  *See, e.g.*, *Caronia*, 703 F.3d at 168 (citing *Sorrell*); *Friendly House v. Whiting*, 846 F. Supp. 2d 1053 (D. Ariz. 2012) ("Here, numerous other traffic regulations are already in place in Arizona to directly address traffic and safety without restricting speech.") (citing *Sorrell*); *Stuart v. Loomis*, 2014 WL 186310, at *23 (M.D.N.C. 2014) ("Rather than more regulations that compel speech from ethical providers, better enforcement of the existing rules is an obvious, more direct solution.") (citing *Sorrell*).  The enforcement of anti-discrimination laws is laudable and lawful.  The same cannot be said for the restriction of truthful speech (and particularly a restriction on the dissemination of a subset of public court records) under the First Amendment.

To further any anti-discrimination policy goals, New York could also prevent race information from becoming a part of the public record in the first place.  For example, although it has so far chosen not to do so, the New York legislature could require courts to redact race information in the same way that Social Security numbers and other personally-identifying information are routinely removed before records become public.  But, in this case, where the challenged race information was widely available as a public record, New York cannot ban a single group of disfavored speakers from disclosing that information to other individuals.  Simply put, "the government had, but failed to utilize, far more limited means of guarding against dissemination than the extreme step of punishing truthful speech."  *Florida Star*, 491 U.S. at 538; *accord Caronia*, 703 F.3d at 168.

In this context, the Court must also consider that while the purpose of the NYFCRA's prohibition of reporting the race of a person is presumably to prevent discrimination, reporting available indentifying information can *help* consumers by providing a user of a consumer report

20

with all available tools to ensure that a given record applies to applicant.  Both federal and state laws evince a strong regulatory concern that information reported by CRAs be correctly attributed to consumers to avoid harming the innocent with false attribution of derogatory information.  That concern is expressed in federal and state laws designed to prevent identity theft, *see* 15 U.S.C. § 1681c(g), as well as notable jury verdicts based on the incorrect attribution of derogatory information.  *See, e.g., Miller v. Equifax Info. Servs., LLC*, 2014 WL 2123560, at *2 (D. Or. May 20, 2014) (affirming seven-figure award for a FCRA claim of misattribution).

Physical descriptors – sex, age and race - as part of identifying information can be helpful to a user in deciding whether a given record actually applies to a given consumer.  The collection of race information in association with criminal records is *standard practice*, as shown by the databases maintained by the Federal Bureau of Investigation, which includes a "race" identifier. FBI: *Age, Sex, and Race of Persons Arrested* (OMB Form No. 1110-0005), *available at* http://www.fbi.gov/about-us/cjis/ucr/nibrs/addendum-for-submitting-cargo-theft-data/asr     (last visited June 11, 2014); *see also* The New York Department of Corrections, *Profile of Inmate Population Under Custody* (2013), *available a*t http://www.doccs.ny.gov/Research/annotate.asp (collecting and publishing information on inmates' races to track inmates and generate reports) (last visited June 11, 2014).  The NYFCRA's prohibition on reporting race thus creates a "Catch-22": a consumer reporting agency can obey the law, and strip out useful information that could help a user avoid mistakenly attributing a criminal record, but by doing so expose itself to lawsuits for reporting incomplete information.  Putative class counsel here, for example, has repeatedly brought lawsuits for allegedly inaccurate matching of information.  *See, e.g.*, *Jones v. Sterling Infosystems, Inc.*, 1:14cv3076 (S.D.N.Y. 2014); *Stoner v. CBA Information Services*, 352 F. Supp. 2d 549 (E.D. Pa. 2005).  Therefore, the NYFCRA also does not "fit" any legislative goals as a result of the fact that it may very well result in consumer harm.

For all of the foregoing reasons, the NYFCRA violates the First Amendment and must be invalidated.[6]

### III.   Plaintiff's claim in Count I violates the dormant Commerce Clause, as the statute in question seeks to regulate wholly extraterritorial commerce.

N.Y. Gen. Bus. Law §380-j(a)(2) mandates that no consumer reporting agency shall "report or maintain in the file on a consumer" information relative to a consumer's race.  *Id.*  In Count I, Plaintiff seeks liability on the basis of the allegation that SafeRent both: (1) maintained; and (2) reported information regarding race.  Compl. ¶ 36.  However, the statute's prohibition on the "maintenance" of public-record race information violates the dormant Commerce Clause due to the fact that it attempts to regulate conduct that is wholly extraterritorial in nature.

### A.   The attempted regulation of wholly-extraterritorial commerce violates the dormant Commerce Clause.

Article I, § 8 cl. 3 of the Constitution provides that "Congress shall have the Power . . . to regulate Commerce with foreign Nations, and among the several States."  *Id.*  "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce."  *South-Central Timber Dev. Inc. v. Wunnicke*, 467 U.S. 82, 82 (1984).  This self-executing limitation is often referred to as the "negative" or "dormant" aspect of the Commerce Clause.  *Oklahoma Tax Comm'n v. Jefferson Lines Inc.*, 514 U.S. 175 (1995).

The dormant Commerce Clause's prohibition on state regulation of interstate commerce furthers two related interests.  One is a vertical limitation, subordinating each state's authority

---

[6] Although the above arguments apply to both the NYFCRA's prohibitions on the "*maintenance* and *reporting*" of race-based public information, these First Amendment concerns are particularly acute in the context of the NYFCRA's illogical prohibition as to the "maintenance" of information regarding a consumer's race.  Indeed, the mere maintenance of such public-record information has *no effect* on any consumer, and it therefore does not reasonably advance or fit any conceivable legislative interest.

over interstate commerce to the federal regulation power, while the other is a horizontal limitation restricting the ability of any one state to use its regulatory powers in a way that encroaches upon the sovereignty of its fellow states. *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 176 (S.D.N.Y. 1997); *see also Gore*, 517 U.S. at 571 (any single state's power to regulate interstate commerce is "not only subordinate to the federal power over interstate commerce, but is also constrained by the need to respect the interests of other States").

As a result of these principles, the Supreme Court has held that a state statute "directly regulating" commerce occurring beyond the boundaries of that state is "*per se* invalid" and must be "generally struck down . . . without further inquiry." *Brown-Forman Distillers Corp. v. New York State Liquor Author.*, 476 U.S. 573, 579 (1986); *see also Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) ("[A] statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid . . . ."). This is so "regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy*, 491 U.S. at 336. Thus, the critical inquiry when determining whether a statute with reach will be deemed *per se* invalid is "whether the practical effect of the regulation is to control conduct beyond the boundaries of the [regulating] State." *Brown-Forman*, 476 U.S. at 579.

**B.      The NYFCRA, as applied to Plaintiff's challenge of SafeRent's maintenance of race-based information, violates the dormant Commerce Clause.**

As applied to its regulation of SafeRent's "maintenance" of information on consumers, the NYFCRA is invalid under the dormant Commerce Clause, given that, according to Plaintiff, SafeRent (an out-of-state company, *see* Dkt. No. 4) conducts its activities "nationwide" and maintains information regarding consumers throughout the United States. Compl. ¶ 7.

The NYFCRA's proscription on the maintenance of information regarding a consumer's race is not limited to: (1) consumer reporting agencies located in New York; (2) databases or files located in New York; (3) information received from New York governmental sources; or

(4) records about New York residents.  *See* N.Y. Gen Bus. Law § 380-j(a)(2).  Through that proscription, however, the NYFCRA seeks to reach into SafeRent's out-of-state databases in order to dictate their content.  Put another way, the NYFCRA has the "effect . . . of control[ling] [database content] in other states," which is not allowed.  *Brown-Forman Distillers Corp.*, 476 U.S. at 573 (a New York law that required liquor distillers selling wholesale in New York to file a monthly price schedule and to sell at the lowest prices the distiller charged wholesale in any other state for the same month had the "practical effect . . . of control[ling] liquor prices in other states."); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935) (striking down statute prohibiting "the sale within the state of milk bought outside unless the price paid to the producers was one that would be lawful upon a like transaction within the state," as "New York has no power to project its legislation into Vermont by regulating the price to be paid in that state . . . .").

The NYFCRA also bears the hallmark of an unconstitutional statute in that companies (such as SafeRent) maintaining databases entirely "outside of [New York] must comply with [the statute] or risk prosecution by [New York]."  *American Booksellers v. Dean*, 342 F.3d 96, 109 (2d Cir. 2003) (striking down statute with that "practical" effect); *see also North Dakota v. Heydinger*, 2014 WL 1612331, at *23 (D. Minn. 2014) ("[T]o ensure compliance with Minn. Stat. § 216H.03, out-of-state parties must conduct their out-of-state business according to Minnesota's terms—*i.e.*, engaging in no transactions involving power or capacity that would contribute to or increase Minnesota's statewide power sector carbon dioxide emissions.  As noted by the Environmental Group Amici, this is the 'paradigm' of extraterritorial legislation.").

The fact that this action involves a New York Plaintiff also does not excuse the clear extraterritorial reach of the NYFCRA, as the NYFCRA still operates to control the database operations of wholly out-of-state businesses.  For instance, in *American Booksellers v. Dean*, the Second Circuit addressed a Vermont statute prohibiting the distribution of sexually explicit

materials to minors via the internet.  342 F.3d at 99.  Despite the fact the statute only facially applied to transactions with Vermont consumers, the court held that the statute amounted to a requirement "that those outside of Vermont must comply with Section 2802a or risk prosecution by Vermont.  Vermont has 'projected' section 2802a onto the rest of the nation."  *Id.*; *accord Pharm. Research & Mfrs. of Am. v. District of Columbia*, 406 F. Supp. 2d 56, 70 (D.D.C. 2005) (although the act that triggered liability under the statute was the sale of drugs in D.C., the court found it "was impossible to contend that this particular application of the D.C. Act does not effect an impermissible extraterritorial reach").  Therefore, there mere fact that a New York resident is serving as a Plaintiff here cannot save the NYFCRA from invalidation.

The NYFCRA has the direct effect of exporting New York's policies into other states.  Consequently, the portion of the NYFCRA that seeks to regulate SafeRent's "maintenance" of information must be struck down "without further inquiry."  *Brown-Forman*, 476 U.S. at 579.

## CONCLUSION

WHEREFORE, CoreLogic SafeRent LLC, respectfully requests that the Court: (1) grant its Motion to Dismiss; and (2) grant it such other and further relief as may be appropriate.

Dated:  New York, New York
June 19, 2014

TROUTMAN SANDERS LLP

By:  /s/ Christina H. Bost Seaton
Christina H. Bost Seaton, Esq.
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 704-6000

*Attorneys for Defendant*